# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| METROPOLITAN ALLIANCE OF | ) | |
| POLICE and JOSEPH KRESCH, President, | ) | |
| Metropolitan Alliance of Police, Chapter 267, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 18 C 2468 |
| | ) | |
| NORTHEAST ILLINOIS REGIONAL | ) | |
| COMMUTER RAILROAD CORP. and | ) | |
| JOSEPH PEREZ, in his individual and | ) | |
| official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Before the Court is Defendants Northeast Illinois Regional Commuter Railroad Corp. d/b/a Metra ("Metra") and Joseph Perez' ("Perez") (collectively, "Defendants") Motion to Dismiss ("Motion") Plaintiffs Metropolitan Alliance of Police and Joseph Kresch's ("Kresch") (collectively, "Plaintiffs") Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), (b)(3), and (b)(6). For the following reasons, Defendants' Motion is granted in part and denied in part.

## BACKGROUND

The Court accepts as true the following well-pled allegations from Plaintiffs' Complaint and attached exhibits. All possible inferences are drawn in Plaintiffs' favor.

*Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (iterating the 12(b)(6) standard); *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995) (iterating the 12(b)(1) standard). Additional background information has been gleaned from exhibits attached to Defendants' Motion. *See* discussion *infra* LEGAL STANDARD.

Defendant Metra is a municipal corporation of the State of Illinois with its principal place of business in Chicago. Metra, the primary operator of commuter passenger rail services in the six-county metropolitan area in Northeast Illinois, is a "carrier" as defined by the Railway Labor Act ("RLA"), Title 45 U.S.C. § 151 *et seq*. Of its 4400 employees, Metra employs approximately 120 police officers. Defendant Perez is the Chief of Police of the Metra Police Department.

Plaintiff Metropolitan Alliance of Police ("MAP") is a labor organization composed of police officers and other police-related employees who maintain full or part-time employment with government agencies, operating upwards of 200 chapters representing over 5000 members. Since 2003, MAP has been the certified labor organization authorized to represent employees of Metra, the craft or class of police officers below the rank of Captain, for purposes of the RLA. MAP, Chapter 267 ("Chapter 267") represents approximately ninety-two police officers at all Metra locations. Plaintiff Kresch, a resident of Carpentersville, IL, is President of Chapter 267, charged with representing the local organization, processing grievances, collectively bargaining with Metra, and enforcing the rights of Chapter 267's members.

### a. Kresch's Purportedly Protected Activity

As President of Chapter 267 and since May 2014: Kresch has filed approximately thirty-eight separate grievances challenging the actions of Metra and Perez; represented approximately fifty members during Metra disciplinary investigations; issued "countless" written and verbal objections or other protests challenging the actions of Metra and Perez; engaged in "numerous" discussions with Perez and other Metra representatives about his members' legal rights; and engaged in "numerous" discussions and meetings with Perez and other Metra representatives regarding Metra's failure to provide safety and well-being to the public by neglecting to provide adequate staffing levels, safety and radio equipment, firearms, and use of force training.

From approximately May 2012 to September 2015, Kresch represented Chapter 267 at the bargaining table for a successor collective bargaining agreement ("CBA") with Metra. During this process, the parties were unable to resolve numerous differences and engaged in mediation in Washington, D.C. beginning in August 2016 (the "Mediation"). The Mediation, a significant financial expense for Metra, was the first time that Chapter 267 required Metra and Perez to travel to Washington, D.C. to resolve a CBA. The negotiations between 2012 and 2015 were also significantly more expensive for Metra than any previous negotiation between Metra and Chapter 267. Additionally, the CBA reached in the Mediation was "significantly more expensive" than what Metra had previously offered.

In the summer of 2016, Kresch complained to Perez and other Metra representatives that their enforcement policies and efforts to discipline officers may have violated the Bill of Rights for the Homeless Act, 775 ILCS 45/1 *et seq*. Kresch's complaint concerned the discipline of Chapter 267 member David Lee and Metra's alleged targeting and discrimination against homeless individuals at Chicago Metra stations.

In December 2016, Kresch complained to Metra Chief Executive Officer Donald Orseno and to the Metra Head of Safety regarding perceived health and safety concerns borne from a continuing water and sewage line blockage. The blockage allegedly resulted in a lack of potable water, unsafe and unsanitary working conditions, a buildup of urine and feces due to non-working flush toilets, and a blocked drain sewer at the Blue Island Metra Police Station.

In April 2017, Kresch raised concerns with Perez that Metra appeared to be discriminating against African Americans and older employees, denying them representation rights, disciplining them more harshly, and treating them less favorably than white and younger employees.

In August 2017, Kresch, invoking the RLA, disputed Metra's implementation of a new general order that would have restricted other employment opportunities for Chapter 267 members. Metra rescinded the order within one week of receiving Kresch's written objection.

In the fall of 2017, Kresch advised the membership of Chapter 267 and the leadership of the other Metra Unions that Metra failed to renew a $14 million grant that would have continued to provide for the safety and security of the public. Kresch alleges that his communications with union members were conducted both on and off duty and with the full knowledge of Perez and Metra.

### b. Alleged Retaliation by Metra

On or about August 31, 2017, Kresch was notified that he was being investigated as to whether he falsified payroll records and misrepresented time worked. The investigation also considered if Kresch failed to devote himself exclusively to Metra duties while on duty by conducting personal business by picking up Chapter 267 mail at a UPS store, in full uniform and using a Metra-owned vehicle, on nine separate occasions.

On October 4, 5, and November 1, 2017, investigation hearings were held. Kresch's immediate supervisors testified that the UPS store was within Kresch's work beat, Kresch was authorized to be at that location while on duty, and Kresch was permitted to take breaks without requesting permission. The supervisors also testified that during these breaks, Kresch was permitted to eat, sleep, use the restroom, use the ATM, go into a store, take personal breaks, and read, all without asking permission. Kresch alleges that his average break was less than one minute, and the total amount of time that he spent at the UPS store was approximately eleven minutes combined over nine occasions. Kresch also alleges that there is no mechanism in the Metra

timekeeping system to record breaks as short as those for which Kresch was under investigation.

The investigative record demonstrated that while Kresch worked for more than eight hours on each day that included a visit to the UPS store, he was paid for only eight hours on each occasion. The record also demonstrated that, as Chapter 267 President, Kresch could adjust his time to conduct union business and did not need to request permission to do so.

Kresch was found guilty by Metra and received a ten-day suspension without pay. Kresch alleges that no other Metra police officer has ever been disciplined for taking short breaks while on duty and Metra and Perez "pre-determined" the level of punishment to assess to Kresch before the investigation. Because of his suspension, Kresch has been placed on "last-chance status," which authorizes his termination for any other rule violation, regardless of how minor, for a period of two years. Kresch's appeal of his suspension, brought under the CBA and RLA, is pending.

On November 29, 2017, after the investigation's conclusion, Kresch submitted a written notice via inter-office mail and email to Perez through administrative secretary Marchell Redmond ("Redmond") to inform Perez of Kresch's pending secondary employment as a part-time police officer in Fox River Grove. Metra and Chapter 267's CBA does not require members to obtain Metra's approval to work secondary employment. Metra and Perez, however, require Chapter 267 members to notify Metra of secondary employment on an annual basis.

On December 5, 2017, Redmond advised Kresch that he would be notified within a day or two regarding his secondary employment. Nine days later, on December 14, 2017, Redmond informed Kresch that his notice was "lost" and he would need to file a new document. Kresch did so the next day, December 15. On December 19, 2017, Redmond notified Kresch that he needed to change his notice and resubmit, which Kresch did the following day, December 20. Almost two full weeks later, on January 2, 2018, Perez denied Kresch's right to work secondary employment, claiming a conflict of interest between Metra and the Fox River Grove Police Department.

Kresch alleges that other Chapter 267 members work secondary employment, some as part-time police officers and law enforcement trainers, and Metra and Perez have never denied any other MAP member the right to work secondary employment. Nor have they ever rejected the secondary employment notice of any other MAP member or requested a re-submission. Metra also does not typically respond in any way to the notifications by Chapter 267 members regarding secondary employment. Kresch alleges that he has lost and continues to lose income that he would otherwise have earned as a part-time officer in Fox River Grove.

Kresch spent December 2017 and January 2018 running for re-election as President of Chapter 267. Kresch alleges that, during the election period, Perez directly contacted Chapter 267 members to attempt to convince them to run for President against Kresch and/or to not support Kresch's election bid. Perez also tried to convince union members to elect someone other than Kresch. Kresch alleges that Perez' actions

interfered with the election and served to sow discord within Chapter 267. Kresch was ultimately reelected, but he alleges that Perez' actions dealt Kresch a loss of significant support from the union's membership.

### c. The Collective Bargaining Agreement

In December 2017, Perez announced a new work rule regarding the use of Portable Audio Video Recorders. That same month, Kresch notified Metra in writing that Chapter 267 believed that the imposition of said rule violated the RLA. The CBA does not authorize Metra to audio and video record the actions of union members, and the new rule imposed surveillance requirements on officers' work duties, including the mandatory use of Portable Audio Video Recorders. Previously, such use was voluntary. The new rule also subjected Chapter 267 members to potential disciplinary action. On or about January 31, 2018, and over Kresch's objection, Metra implemented the new policy.

In or about January 2018, Metra also implemented a new Secondary Employment Policy that imposed new working conditions on Chapter 267 members. This despite Metra having rescinded a different secondary employment restriction, discussed *supra* BACKGROUND § a., five months prior in August 2017. The Secondary Employment Policy restricted the actions of off-duty union members and interfered with their ability to earn additional income while off duty.

The CBA contains a number of relevant Rules, the following of which are relevant to this dispute. Pursuant to Rule 1, "Scope," the CBA covers "the rates of pay,

hours of service, benefits, and working conditions of all employees classified herein as Police Officers." Rule 2, "Definition of Police Officer," defines "Police Officers" as lieutenants, sergeants, and patrolmen.

Rule 22, "Machines, Equipment, and Supplies Furnished," states in relevant part:

(a) If [Metra] requires an employee to use…equipment and supplies in the performance of service for the company, such items shall be furnished and maintained by the company, without expense to the employee.

Rule 25, "Investigation and Discipline," states in relevant part:

(a)…An employee may be held out of service for serious offense(s) pending an investigation and decision thereafter. The employees shall be notified in writing of the specific charge against him…. Employees will be permitted to have up to two duly accredited representatives along with witnesses of their choice present….

(c) If an employee or the duly accredited representative is not satisfied with the decision rendered following the investigation, an appeal may be made in accordance with Rule 27.

Rule 26, "Unjust treatment," states in relevant part:

(b) An employee who considers himself unjustly treated shall have the same right of hearing and appeal as provided in Rule 25 if written request containing specific reasons for complaint is made to his immediate superior or appropriate officer of [Metra] within thirty (30) days of the cause of the complaint.

(c) This rule does not apply to grievances in connection with time claims or to the appeal of [Metra] decisions made pursuant to Rule 25 which must be progressed in accordance with provisions of Rule 27.

Rule 27, "Time Limit on Claims and Grievances," states in relevant part:

(a) All claims and grievances must be presented, in writing…within sixty (60) days from the date of the occurrence on which the claim or grievance is based….

(b) If a disallowed claim or grievance is to be appealed, such appeal must be in writing and must be taken within sixty (60) days from receipt of notice of disallowance and the representative of [Metra] shall be notified in writing within that time of the rejection of his decision…. It is understood…that the parties may, by agreement, at any stage of the handling of a claim or grievance on the property, extend the sixty (60) day period for either a decision or appeal, up to and including the highest officer of [Metra] designated for that purpose.

(c) The requirements outlined in paragraphs (a) and (b) pertaining to appeal by the employee and decision by [Metra] shall govern in appeals taken to each succeeding officer, except in cases of appeal from the decision of the highest officer designated by [Metra] to handle such disputes. All claims or grievances involved in a decision by the highest designated officer shall be barred unless within nine (9) months from the date of said officer's decision proceedings are instituted by the employee or his duly accredited representative before the Division of the National Railroad Adjustment board or a system, group, or regional board of adjustment….

Rule 52 defines "Duly Accredited Representative" as "the elected Chapter President and/or official Board Officer…representing the employees covered by the Agreement, under the provision of the [RLA] and signatory hereto." Under Rule 52, "duly accredited representatives will be granted necessary time off to conduct Organization business."

\*       \*       \*

On April 6, 2018, Plaintiffs filed their six-count Complaint, which states the following causes of action. Counts I and II, brought by Kresch individually under 42 U.S.C. § 1983, the First Amendment of the United States Constitution, and Article I, §§ 4 and 5 of the Illinois Constitution, allege retaliation in violation of Kresch's right

to free speech and association.  Count I is alleged against Perez in his individual capacity; Count II is against both Perez in his official capacity and Metra.  Plaintiffs bring Counts III, IV, V, and VI pursuant to the RLA, 45 U.S.C. § 152, First, Third, Fourth, and Ninth, respectively.  In relevant part, those statutory provisions state as follows.  45 U.S.C. § 152, First:

> It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operations of any carrier growing out of any dispute between the carrier and the employees thereof.

45 U.S.C. § 152, Third:

> [N]either party shall in any way interfere with, influence, or coerce the other in its choice of representatives.

45 U.S.C. § 152, Fourth:

> [I]t shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining, or in performing any work thereof, or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization….

45 U.S.C. § 152, Ninth:

> [T]he carrier shall treat with the representative so certified as the representative of the craft or class for the purposes of this chapter….

Each of the six counts seeks some discrete form of injunctive, declaratory, and compensatory relief.

## LEGAL STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the Complaint, not the merits of the case. *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 878 (7th Cir. 2012). The allegations in the Complaint must set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Plaintiffs need not provide detailed factual allegations, but they must provide enough factual support to raise their right to relief above a speculative level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A claim must be facially plausible, meaning that the pleadings must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The claim must be described "in sufficient detail to give the defendant 'fair notice of what the…claim is and the grounds upon which it rests.'" *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim," and may be considered in a district court's ruling on a motion to dismiss. *Wright v. Assoc. Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand a 12(b)(6) motion to dismiss. *Iqbal*, 556 U.S. at 678.

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) tests the jurisdictional sufficiency of the Complaint, but it is otherwise "analyzed as any other motion to dismiss." *United Phosphorus, Ltd., v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003), *overruled on other grounds by Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012). For 12(b)(1) considerations, the Court "may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Capitol Leasing Co. v. F.D.I.C.*, 999 F.2d 188, 191 (7th Cir. 1993) (internal citation and quotation marks omitted). "The burden of proof on a 12(b)(1) issue is on the party asserting jurisdiction." *United Phosphorus*, 322 F.3d at 946.

## DISCUSSION

### I. Jurisdictional Considerations under Rule 12(b)(1)

Before the Court can entertain the RLA-based claims, Counts III, IV, V, and VI, it must tend to a critical jurisdictional question: whether the discrete factual disputes alleged in the Complaint are "major" or "minor." This inquiry is vital, since "[a] minor dispute in the railroad industry is subject to compulsory and binding arbitration before the National Railroad Adjustment Board...or before an adjustment board established by the employer and the unions representing the employees." *Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299, 303 (1989) ("*Conrail*"). "[The labor board] has exclusive jurisdiction over minor disputes." *Id*. at 304. "The upshot: because the RLA compels arbitration of minor disputes, this Court lacks subject-matter-jurisdiction over

13

such disputes." *Bhd. of R.R. Signalmen v. Connex R.R., LLC*, 184 F.Supp.3d 645, 647 (N.D. Ill. 2016).

The Supreme Court has "defined minor disputes as those involving the interpretation or application of existing labor agreements." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 256 (1994); *see Conrail.*, 491 U.S. at 305 ("The distinguishing feature of [a minor dispute] is that the dispute may be conclusively resolved by interpreting the existing [CBA]"). As a jurisdictional requirement, Plaintiffs carry the burden of showing that their allegations are not minor. *United Phosphorus*, 322 F.3d at 946.

It is with this burden in mind that the Court expresses its profound befuddlement at Plaintiffs' failure to oppose Defendants' lengthy argument that the Complaint raises exclusively minor disputes. Rather than substantively respond to Defendants' minor-dispute contentions, Plaintiffs posit, without citation to any caselaw, "The fact Defendants opine this is a minor dispute, is not appropriate for a Motion to Dismiss under Rule 12. Therefore, [the Motion] pursuant to Section 12(b)(1) must be denied in its entirety."

Plaintiffs' posture is perplexing. Rule 12(b)(1) exists precisely for the situation presently before the Court, to dispose of cases that district courts lack the authority to adjudicate. Moreover, aplenty is the binding precedent from the Seventh Circuit affirming district courts' 12(b)(1) dismissals. *See Monroe v. Mo. Pac. R.R. Co.*, 115 F.3d 514 (7th Cir. 1997) and *Bielicke v. Terminal R.R. Ass'n*, 30 F.3d 877 (7th Cir.

1994) (each affirming district courts' 12(b)(1) dismissals under the RLA of plaintiffs' employment disputes with their employer railroad companies). Plaintiffs were wrong to suggest that Defendants improperly raised the major-minor dispute issue at the 12(b)(1) stage, and their citation to *Vidovic v. Losinjska Plovidba Oour Broadarstvo*, a 1994 Eastern District of Pennsylvania case, is unavailing. 868 F.Supp. 691 (E.D. Pa. 1994). *Vidovic* is non-binding, and Plaintiffs rely exclusively on its discussion of pleading standards that have long since been contravened in this circuit and others. And, since it is Plaintiffs' burden to show that the Court has jurisdiction over their claims – a burden they have plainly failed to carry in light of Defendants' compelling arguments that the allegations before the Court indicate minor disputes – their oversight is not only problematic, it is fatal.

In the interest of justice, we address Defendants' applications of Rule 12(b)(1) to the Complaint's distinct factual allegations. Before doing so, however, we note that the well-established consequence of Plaintiffs' failure to respond to Defendants' minor-dispute argument is concession. "It is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel." *Beard v. Whitley Cnty. REMC*, 840 F.2d 405, 408—09 (7th Cir. 1988). "Longstanding under our case law is the rule that a person waives an argument by failing to make it before the district court. We apply that rule…where a litigant effectively abandons the litigation by not responding to alleged deficiencies in a motion to dismiss." *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011). Although the

Court has considered Defendants' position substantively and found it meritorious on the 12(b)(1) issue, the Court stresses that any opposition to our conclusion was waived when Plaintiffs abandoned their jurisdictional responsibility.

Turning to the substance of the Motion, Plaintiffs point out that MAP and Metra collectively bargained for discipline, unjust treatment, and grievances. The propriety of both Kresch's 10-day suspension and the investigation that led to said discipline are questions requiring the interpretation of the CBA's relevant provisions, namely Rules 25, 26, and 27. Such an interpretative question is squarely within the contours of a minor dispute, and beyond this Court's jurisdiction. *See Monroe*, 115 F.3d at 519 (finding a minor dispute where the allegations did not merely raise the employee's discipline, but rather "involve[d] the propriety of [the plaintiff's] discharge"); *Bielicke*, 30 F.3d at 878 (finding a minor dispute where the complaint alleged that the defendant company "'unfairly and vindictively investigated' the plaintiffs").

The same goes for Metra's decisions to deny Kresch's secondary employment request. Defendants' decision to withhold such opportunity does not glisten with good nature and fairness. Nonetheless, working conditions are the subject of Rule 1, and a determination of their scope necessarily requires interpretation of the CBA. That we remain skeptical of the impartiality of Metra's decision-making process does not vest the Court with the jurisdictional authority to jurisprudentially delve into our moral curiosity.

The body camera issue also falls neatly within the contours of the CBA. Rule 22 is a seemingly by-the-book equipment policy. Any grievance with the body camera implementation must grapple with the language of Rule 22. As Defendants point out, *Conrail* unambiguously supports the proposition that, in a contractual agreement, the absence of presaged circumstantially specific language does not inherently undermine a CBA to the extent that unforeseen discrete disputes automatically become major. 491 U.S. at 318. "[L]abor laws do not require all the details of particular practices to be worked out in advance." *Id*. Rule 22 contemplates equipment distribution and usage, and the decision to require body cameras inheres in that language.

It is these three groupings of allegations – Defendants' discipline of Kresch, Defendants' denial of Kresch's secondary employment request, and Defendants' implementation of the body camera policy – that comprise Plaintiffs' essential accusations of misconduct. Under the RLA, which grounds Counts III-VI, these allegations raise minor disputes. The Court retains no jurisdiction over such disputes, and it dismisses Counts III, IV, V, and VI under Rule 12(b)(1).[1]

---

[1] Defendants also mention Rule 12(b)(3) in their Motion as a ground for dismissal. They do not develop this argument in any way, shape, or form. And, in any event, any relief available under 12(b)(3) would merely duplicate the effect of our 12(b)(1) ruling. Because the RLA counts are dismissed under 12(b)(1), the Court declines to entertain Defendants' arguably nonexistent 12(b)(3) contention.

## II.    Free Speech Claims – Counts I & II

### a.  Illinois Constitution

"[W]here adequate remedies exist under state common law or federal law for certain causes of action, a plaintiff may not maintain an independent cause of action under the Illinois Constitution." *S.J. v. Perspectives Charter School*, 685 F.Supp.2d 847, 862 (N.D. Ill. 2010).  Pursuant to this principal, Defendants request dismissal of the first two counts' independent causes of action brought under the Illinois Constitution.  Plaintiffs do not contest Defendants' request, and their requests for relief under § 1983 and the First Amendment demonstrate an adequate federal free speech remedy.  Insofar as Counts I and II press independent claims under the Illinois Constitution, they are dismissed.

### b.  Count II Against Perez in his Official Capacity

Similarly, Plaintiffs decline to oppose Defendants' contention that claims against public employees in their official capacity are duplicative of claims against the public employer.  Indeed, "[s]uits against state officials in their official capacity…should be treated as suits against the State." *Hafer v. Melo*, 502 U.S. 21, 25 (1991).  Therefore, Count II, as against Perez in his official capacity, is dismissed.

### c.  Actionability of the Free Speech/Association Claims

Left standing are Counts I and II, brought by Kresch as an individual, against Perez in his individual capacity and Metra, respectively.  Defendants ask the Court to dismiss these counts for two distinct reasons.  First, they urge us to find that the

Complaint fails to state a plausible free speech claim and dismiss the first two counts under Rule 12(b)(6). Second, they claim that both counts are "preempted" by the RLA and require dismissal. We address each argument in turn.

### i. Failure to state a plausible free speech claim

Two years ago, in a case cited by Defendants, this Court elucidated a standard for analyzing a claim of free speech retaliation. *See Davis v. City of Chi., Ill.*, 162 F.Supp.3d 726, 731 (N.D. Ill. 2016), *aff'd sub nom. Davis v. City of Chi.*, 889 F.3d 842 (7th Cir. 2018). We reiterate that standard here.

"To establish a claim for retaliation in violation of the First Amendment, a public employee must prove that: (1) his speech was constitutionally protected, (2) he has suffered a deprivation likely to deter speech, and (3) his speech was at least a motivating factor in the employer's action." *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013). The first step in the analysis requires the Court to determine whether Kresch's speech is constitutionally protected. Such an inquiry is "a question of law to be decided by the court." *Volkman v. Ryker*, 736 F.3d 1084, 1089 (7th Cir. 2013). "For a public employee's speech to be protected under the First Amendment, the employee must establish that she spoke as a citizen on a matter of public concern," *Kubiak v. City of Chi.*, No. 14-3074, 2016 WL 106868, at *3 (7th Cir. Jan. 11, 2016) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). Kresch must also show that "the state's interests as an employer in 'promoting effective and efficient public service'" do not outweigh the employee's interest in expressing that speech. *Swetlik*, 738 F.3d at 825.

The threshold question and the focal point of the parties' dispute is whether Kresch was speaking as a citizen on a matter of public concern. "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Garcetti*, 547 U.S. at 418. If, however, Kresch spoke as a citizen on a matter of public concern, then he is subject to "only those speech restrictions that are necessary for [his] employers to operate efficiently and effectively." *Id*. at 419.

Strangely, Defendants go to the trouble of citing the standard this Court propounded in *Davis*, only to fail to press an argument in keeping with its tenets. The thrust of Defendants' position is that Kresch's "speech was motivated by personal concerns, i.e., his discipline for doing union work while on Metra duty and the denial of his secondary employment request." To that end, certainly "if the objective of the speech—as determined by content, form, and context—is simply to further a purely personalized grievance, then the speech does not involve a matter of public concern." *Kristofek v. Vill. of Orland Hills*, 712 F.3d 979, 986 (7th Cir. 2013). Here, however, most of the protected speech that Kresch highlights in his Complaint occurred before either his disciplinary proceedings began or his secondary employment was denied. How Kresch's utterance of speech that preceded the imposition of his suspension could have been motivated by then-nonexistent discipline is beyond the Court's present comprehension.

Moreover, *Kristofek* makes clear that, while "[t]he motive of the speaker is relevant as part of the 'context' in which the speech was made,…content 'remains the

most important factor in determining whether speech addresses a matter of public concern.'" *Id*. at 984 (quoting *Chaklos v. Stevens*, 560 F.3d 705, 712 (7th Cir. 2009)). In this case, the Court finds that the speech alleged in the Complaint, assumed to be true for purposes of this Motion, rises to the level of public concern. Kresch's speech included complaints stemming back to 2014 about Metra's failure to ensure the safety and well-being of the public via its neglect of adequate staffing levels, safety and radio equipment, firearms, and use of force training. A summer 2016 complaint focused on Perez and Metra's alleged targeting of and discrimination against homeless individuals at Chicago Metra stations. An April 2017 complaint raised concerns over Perez and Metra's apparent discrimination against African American and older employees. Defendants decline to suggest that these instances are anything but speech worthy of public concern.

"The Supreme Court has defined 'public concern' to mean 'legitimate news interest,' or 'a subject of general interest and of value and concern to the public at the time of publication.'" *Meade v. Moraine Valley Cmty. Coll.*, 770 F.3d 680, 684 (7th Cir. 2014) (quoting *City of San Diego v. Roe*, 543 U.S. 77, 83—84 (2004)). The Court believes that the speech alleged in the Complaint rises to this level. Because Kresch's speech, as alleged, was of public concern, Defendants raised no other substantive issue with Kresch's free speech claims, and Defendants offered no argument against Kresch's freedom of association claims, the Motion's plea for Counts I and II's dismissal under Rule 12(b)(6) is denied.

### ii. Preclusion

Having found Counts I and II substantively viable, we must now determine if they are "precluded" by the RLA.[2]  Preclusion "under the RLA exists when 'the success of the claim is dependent upon an interpretation of the collective bargaining agreement's terms.'"  *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 757 (7th Cir. 2008).  We have already determined that resolution of Counts III-VI necessarily require an interpretation of the CBA at issue and are consequently beyond the jurisdiction of this Court.  Defendants contend that Counts I and II similarly depend upon a construction of the CBA, and are so precluded by the RLA.  Plaintiffs dedicate the bulk of their opposition brief on this issue, their argument essentially boiling down to the proposition that "Plaintiffs' Constitutional claims are sufficient to stand apart from the need to search for any allegations of contractual violations and therefore can proceed independently."

As Plaintiffs acknowledge, there is a frustrating dearth of precedent on the intersection of the First Amendment, § 1983, and RLA preclusion.  The only case-on-point cited by either party is a 1980 decision from the Southern District of Georgia, *Hodges v. Tomberlin*, 510 F.Supp. 1280 (S.D. Ga. 1980).  In *Hodges*, the district court equivocated, but ultimately declined to find that the RLA precluded the plaintiff's free speech retaliation claim, stating that it "cannot conclude…that § 1983 and the RLA do

---

[2] The parties refer to the issue as one of "preemption."  It is a distinction without a functional difference, but disputes potentially subject to mandatory arbitration raised in a *federal* claim, like those under § 1983 in Counts I and II, are "precluded" – "preemption" is reserved for mandatorily arbitrated disputes raised in *state* law claims.

not provide supplementary rather than conflicting grounds for relief." *Id*. at 1285. The court did note that several then-recent cases "dealing with other statutes and the [RLA]…support the proposition that [the RLA] is not to be construed as an exclusive remedy." *Id*. This proposition has since become axiomatic: "disputes over rights under a collective bargaining agreement must be resolved by an arbitrator while claims based on rights with an independent basis may be litigated as usual." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 832 (7th Cir. 2014); *see Rabe v. United Air Lines, Inc.*, 636 F.3d 866, 873 (7th Cir. 2011) (plaintiff's Title VII, ADEA, and IHRA claims were not precluded and preempted where they did not bring the relevant policy of the collective bargaining agreement into dispute).

Here, we have determined that the propriety of the discipline that Kresch was subjected to requires interpretation of the CBA. However, the appropriateness of said discipline under the CBA is not contemplated in Kresch's First Amendment claims. Put another way, while Counts III-VI turn on an interpretation of Defendants' conduct under the CBA, Counts I and II require no such discernment. Rather, Kresch's free speech claims merely assert that the alleged retaliatory misconduct, untethered from its sanction, licensure, or lack thereof by the CBA, violated Kresch's First Amendment right in and of itself. The Court is confident that this is what Plaintiffs had in mind when they suggested that their Constitutional claims stood free and clear from their RLA claims.

Whether Defendants operated within the strictures of the CBA, and pursuant to the RLA, when they disciplined Kresch and denied him his secondary employment request is a discrete question better left to the jurisdiction of the labor boards. The separate questions of whether said discipline constituted a deprivation likely to deter speech and was motivated by Kresch's protected speech are "purely factual questions…[n]either of [which] requires a court to interpret any term of a collective-bargaining agreement." *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 407 (1988). These are constitutional questions that stand independent of the RLA's concern for CBA interpretation. They are properly raised in federal court and not precluded by the RLA. The Motion is denied as to the § 1983 free speech and association claims in Counts I and II.

## CONCLUSION

For the reasons above, the Defendants' Motion is granted as to Counts III, IV, V, and VI. It is also granted as to Count II's inclusion of Perez in his official capacity and the Illinois Constitutional claims in Counts I and II. It is denied as to the remaining § 1983 First Amendment claims in Counts I and II. It is so ordered.

Charles P. Kocoras
_____

Dated: 8/31/2018                         Charles P. Kocoras
                                             United States District Judge